IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 8, 2025 Session

## STATE OF TENNESSEE v. CAPRICE LASHON PEETE

**Appeal from the Circuit Court for Tipton County**
**No. 10548     A. Blake Neill, Judge**
_____

### No. W2024-00715-CCA-R3-CD
_____

The Defendant, Caprice Lashon Peete, was convicted by a Tipton County Circuit Court jury of first degree premeditated murder, for which he received a sentence of life imprisonment.  On appeal, the Defendant challenges the sufficiency of the evidence and argues that the trial court erred by not excusing a juror who failed to disclose that she knew one of the State's primary witnesses, by not allowing the Defendant to cross-examine another State's witness about the underlying facts of the witness's 2023 conviction for convicted felon in possession of a firearm, and by allowing the prosecutor to make inappropriate comments in closing argument without an adequate curative instruction by the trial court or the trial court's enforcing its order that the prosecutor retract the inappropriate comment.  The Defendant further argues that he is entitled to a new trial under the doctrine of cumulative error.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and MATTHEW J. WILSON, JJ., joined.

William D. Massey and Seth M. Seagraves, Memphis, Tennessee (on appeal), and Seth M. Seagraves and Jason Ballenger, Memphis, Tennessee (at trial), for the appellant, Caprice Lashon Peete.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Mark Davidson, District Attorney General; and James Walker Freeland, Jr. and Stephanie Draughon, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

Early in the afternoon of Sunday, December 27, 2020, Dontavious Edwards was shot multiple times on Wooten Street in a residential neighborhood of Covington. The victim was airlifted to a hospital in Memphis but did not survive. A few minutes prior to the shooting, a neighbor, Earline Taylor, saw the victim walking down the street talking or "rapping" on his cell phone and the Defendant and Terrance Sharell Taylor ("Codefendant Taylor") exiting the Defendant's aunt's house carrying guns. Ms. Taylor knew all three men. While Ms. Taylor was searching for her cell phone to call 911, she heard gunshots. By the time she looked back outside, the victim had been shot, and a car was leaving the scene. The Defendant was apprehended in Alabama, where he gave statements in which he admitted hitting the victim with his hand but said that it was Codefendant Taylor who shot the victim. On July 12, 2021, the Tipton County Grand Jury returned an indictment charging the Defendant and Codefendant Taylor with the first degree premeditated murder of the victim. The cases were subsequently severed, and the Defendant proceeded to trial alone on July 26, 2023.

Dr. Juliette Scantlebury, the medical examiner who performed the autopsy of the victim's body, testified that the cause of death was a gunshot wound to the abdomen, and that the manner of death was homicide. She stated that the victim sustained five gunshots - - one in the abdomen, one in the right knee, and three in the left thigh. Each of the bullets passed through the victim's body, creating an entrance wound and a corresponding exit wound. In the case of the fatal gunshot, the bullet entered at the victim's lateral right back and exited at the victim's left lateral abdomen. The gunshot wounds to the victim's legs consisted of an entrance wound to the right knee and exit wound at the right lower leg, an entrance wound to the left medial thigh and exit wound at the left posterior thigh, an entrance wound to the left anterior thigh and exit wound at the left medial thigh, and an entrance wound to the left posterior thigh and exit wound at the left anterior thigh. Dr. Scantlebury did not find any bullets or bullet fragments in the victim's body, and there were no injuries to the victim's hands.

Dr. Scantlebury testified that the victim's toxicology report identified the presence of midazolam, morphine, Fentanyl and metabolites of marijuana. She said that the Fentanyl was likely administered by EMS or hospital staff. At the request of the State, she then read aloud a portion of the EMS treatment summary that detailed the administration of Fentanyl to help calm the victim's agitation. Dr. Scantlebury testified that a body that is close to a gun's muzzle when shot may exhibit soot, or a deposit of gunpowder, and stippling, or small abrasions on the skin. She said she found neither soot nor stippling on the victim's body but explained that the victim's clothing might have acted as a barrier.

- 2 -

On cross-examination, Dr. Scantlebury read statements in the EMS treatment summary that included the following: "Patient stated he does not know who shot him or what he was shot with. Gunshot wounds looked low caliber like 9mm. Patient had three gunshot wounds to the left leg and upper thigh, knee, and lower leg." Dr. Scantlebury acknowledged that the absence of soot and stippling made it impossible to determine at what range the shots originated, and that the absence of bullets made it impossible to determine what gun fired the shots. She also acknowledged that there could have been drugs in the victim's system that were not included in the basic drug panel. She said she did not swab or test the victim's hands.

On redirect examination, Dr. Scantlebury read additional statements from the EMS treatment summary about the victim's "going in and out of consciousness" with his blood pressure remaining low.

The victim's mother, Melissa Griggs, testified that the victim, twenty at the time of his death, lived in her Virginia Avenue home with her, the victim's father, the victim's older brother, the victim's sister, and the victim's sister's three children. She later identified on a map the scene of the shooting as "just around the block" from her Virginia Avenue home. She said that the victim did not have a car, and that he regularly walked to Wooten Street to "hang out" at the Cleaves' home. She stated that the victim had a cell phone, that he smoked marijuana, and that he did not possess a gun. She identified the Defendant as a long-term friend of the victim's and said that Codefendant Taylor was someone with whom the victim at one point "was hanging for a little while."

Ms. Griggs testified that she was at work on the afternoon of December 27, 2020, when the victim's godmother called to tell her that the victim had just been shot. She said the victim was airlifted to a hospital in Memphis, where he underwent emergency surgery but ultimately died. When asked if she received any of the victim's personal effects, Ms. Griggs stated that she received the victim's shoes and cell phone. On cross-examination, she testified that her son, Christopher, brought her the victim's cell phone and shoes, telling her that "Francis" had taken them "off of [the victim] at the time." On redirect examination, she testified that the victim's cell phone and shoes were given back to her "[t]he same day that the incident happened."

Earline Taylor, a teacher's assistant at Covington High School, testified that she had known the Defendant for years. She said she also knew the victim and Codefendant Taylor. She stated that she was standing at the front door of her Wooten Street home early on the afternoon of December 27, 2020, when she saw the victim walking down the street either talking or rapping on his cell phone, and the Defendant and Codefendant Taylor "coming out of [the Defendant's] aunt's house with guns in their hand." She stated that the Defendant's aunt's house was across the street from her home. She said she went to her

bedroom to call 911 as soon as she saw Codefendant Taylor and the Defendant coming out of the house carrying guns. By the time she made it to her bedroom, she heard gunshots. After she called 911, she returned to the front of her home, where she saw a car leaving the scene. She then went outside to find the victim lying on his back in the driveway of the Cleaves' home, which was across the street and "catty-cornered" to the Defendant's aunt's house.

On cross-examination, Ms. Taylor testified that she called 911 because there had been several prior shootings in the area, including in her backyard, and she was "fed up." She agreed that she lived in a dangerous neighborhood and that there were bullets in her neighborhood from prior shootings. She acknowledged that she did not see the events that immediately preceded the shooting.

Kalea Davis, Codefendant Taylor's former girlfriend, testified that she and Codefendant Taylor spent the night of December 26, 2020, at her Ripley home. The next day, she and Codefendant Taylor went in her mother's car to the Defendant's aunt's house on Wooten Street for Codefendant Taylor to pick up his clothes. Ms. Davis testified that, as she was driving down Wooten Street, she passed the victim walking on the left side of the street in the same direction that she and Codefendant Taylor were traveling. She said she drove to the end of the street, turned around in the cul-de-sac, and parked in front of the Defendant's aunt's house with her car facing the victim as he walked down the street. She stated that the Defendant arrived in a separate vehicle a short time later and pulled into the driveway. She said that Codefendant Taylor was waiting for the Defendant to let him into the house. After the Defendant's arrival, Codefendant Taylor and the Defendant went into the house together to get Codefendant Taylor's clothes while she remained in her mother's car. Codefendant Taylor was carrying a handgun, and the Defendant was carrying a "big gun" "like an AK."

Ms. Davis testified that she was the only one who noticed the victim walking down the street. She said the victim was approaching her car, still walking on the street, when the Defendant and Codefendant Taylor exited the house carrying their respective guns. The next thing she saw was the Defendant and the victim in front of her car "tussling," which she later called "wrestling." She did not see how the wrestling started. The Defendant was holding his gun in one hand as he wrestled with the victim. She never saw the victim with a gun, and she was unsure of Codefendant Taylor's location at that time. As the victim and the Defendant wrestled, she heard a gunshot. At that point, she ducked down in the car. She could not remember how many total gunshots she heard, and she did not know who fired the gunshots. She saw the Defendant and the victim only in front of her car, but she later noticed a bullet hole in the driver's door.

- 4 -

Ms. Davis testified that after the shooting stopped, the Defendant and Codefendant Taylor got in the car with her, and the three of them left. She stated that they went first to her home in Ripley and then headed toward Jackson on the interstate. They did not discuss what had happened during the drive from Wooten Street to her Ripley home, or during the drive from her home to Jackson. She could not recall whose idea it was to go to Jackson but said that she had a flat tire as they were coming into Jackson. She stated that she called her uncle to come fix her tire. In the meantime, either the Defendant or Codefendant Taylor called someone else, who picked up her, the Defendant, and Codefendant Taylor and took them to the home of someone in Jackson that Codefendant Taylor knew. From there, she took an Uber back to her car, where her uncle met her and fixed the tire. Neither the Defendant nor Codefendant Taylor accompanied her back to her car.

When asked if she had feared the victim, Ms. Davis replied that the victim was "[b]uck jumping" as he approached her car before the Defendant and Codefendant Taylor emerged from the house. She stated that buck jumping was "[j]umping up and down, waving hands." When asked if she thought the victim's behavior was "scary" or felt herself in any danger, she responded, "Ain't know what he was doing." She acknowledged that she never told Codefendant Taylor or the Defendant about the victim's "buck jumping" and did not express any nervousness about the victim's behavior. She further acknowledged that, during the victim's approach, she remained on her phone on "Tik Tok." She testified that the Defendant and Codefendant Taylor had their respective guns with them during their drive to Jackson, and that both men still had their guns when they went to the house in Jackson.

On cross-examination, Ms. Davis testified that buck jumping was "just jumping up and down, bucking." When asked if it was aggressive, she responded "yeah, kind of" and agreed that it was "[k]ind of getting hyped up or something[.]" She also agreed that she had previously testified at the preliminary hearing "that it was something [a]kin to maybe wanting to fight." She stated that when she and Codefendant Taylor drove past the victim, Codefendant Taylor, who was possibly on his phone at the time, was "[j]ust sitting there." She said that the Defendant arrived alone in a vehicle one to two minutes after she and Codefendant Taylor pulled up to the house. However, after having her memory refreshed by her statements to police, she testified that the Defendant's sister was with the Defendant, and that the Defendant's sister went into the house with the Defendant and Codefendant Taylor. She said that approximately three or four minutes after Codefendant Taylor, the Defendant, and the Defendant's sister went into the house, she saw the victim approaching her car.

Ms. Davis acknowledged that, in her earlier testimony, she said that the victim moved from the street to the yard of the Defendant's aunt's house and "was just buck jumping around [her] car." She stated that when the Defendant and Codefendant Taylor

- 5 -

emerged from the house, the Defendant and the victim exchanged "words[,]" got very close to each other, and began wrestling in front of her car. After a few seconds, she heard a gunshot, laid down, and then heard three or four more gunshots. When she lifted her head back up, the Defendant and Codefendant Taylor were inside the car with her, and the victim was lying on the ground beside her car.

Ms. Davis acknowledged having said in a statement to police that she had been scared. She testified that she was scared because she "heard gunshots, and [she] didn't know where it was coming from." She further acknowledged having said that it was Codefendant Taylor's suggestion that they drive to Jackson. She testified that she never saw the victim with a weapon but at one point during the victim's "tussle" with the Defendant, she saw the victim reach his hand into the victim's pants pocket.

On redirect examination, Ms. Davis testified that the first time she was scared was after the gunshots were fired.

Octavious Bady, who acknowledged that he was also known as Octavius Suggs, testified that he pled guilty in 2023 to felon in possession of a firearm based on an event in November 2021, and in 2018 pled guilty to possession of marijuana with the intent to deliver based on an event that occurred in 2016. He stated that he knew the victim, the Defendant, and Codefendant Taylor and described his relationship with all three men as "[l]ike family." He said the victim and the defendants also knew and were friendly with each other.

Mr. Bady testified that on December 27, 2020, he was living at a house on Wooten Street located across the street from the Defendant's aunt's house. That morning, the victim called to say that he was on his way over to visit. Mr. Bady explained that he and the victim planned to hang out together and smoke, as they regularly did. However, before the victim arrived, Mr. Bady heard gunshots, ran outside, and saw the victim hopping toward him on one leg as the victim called out for help. Mr. Bady said he grabbed the victim in his arms and laid him down on the grass by the road. He stated that the victim told him that he had been shot and asked him to call the victim's mother. He said the victim did not have a gun.

Mr. Bady testified that he was still on the scene when EMS and the police arrived, but that he went back into his house without talking to the police. He acknowledged that he did not speak of his involvement until the name "Octavius Suggs" came up in the Defendant's interview with police as an individual who had been present at the scene. When asked why he did not talk to the police on the day of the shooting, he replied that he was "[f]resh off probation" and that he did not "deal with" the police. He acknowledged that his conviction for felon in possession of a firearm was based on a November 5, 2021,

incident and testified that the gun involved in that conviction did not come from the Defendant or Codefendant Taylor and was completely unrelated to the victim's case.

On cross-examination, Mr. Bady acknowledged that the victim did not tell him that the Defendant shot him. He repeated that the victim did not have a gun and said that he did not check the victim's waistband, "hoodie" or pants pockets, and did not take anything off the victim. He stated that he did not know the victim had a cell phone and was not feeling for anything in the victim's pockets. He was adamant that the victim did not have a gun. He acknowledged that the reason he did not come forward to the police was because he was a convicted felon and agreed that, if the victim had a gun, he could not be around the victim.

On redirect examination, Mr. Bady acknowledged that the victim never named anyone as the shooter.

Covington Police Department ("CPD") Sergeant Billy Campbell, who identified himself on a police body camera video recording, testified that he arrived at the scene at approximately 1:04 p.m. to find three other police officers already present and a large crowd gathered. On cross-examination, he acknowledged that a police officer who could be seen on the body camera video recording crouched down beside the victim was Officer Bean. After a portion of the video recording was played again, he testified that Officer Bean was asking the victim for his identification and telling the victim to relax. He indicated that he could not hear Officer Bean asking the victim if he knew who shot him and said that he could not tell from the video recording if the victim was shaking his head "no."

CPD Sergeant William Nelson testified that on December 27, 2020, he was with the criminal investigative division ("CID") and the on-call investigator dispatched to the scene. He stated that one 223/5.56 shell casing, which was a round normally fired "out of a rifle or a very large pistol[,]" and two 9mm shell casings, which were pistol caliber rounds, were recovered from the roadway in front of the Defendant's aunt's house. No guns or cell phones were recovered from the scene.

Sergeant Nelson testified that Ms. Taylor provided the names of the Defendant and Codefendant Taylor and a description of the car. He said they used the "flock system[,]" a "nationwide network of cameras that observe roadways[,]" to find a similar car leaving the area and then put out a BOLO for the car and the suspects. He stated that they received a call from Tiffany Cohill informing them that her daughter, Kalea Davis, had been driving the car. He said that Ms. Cohill and Ms. Davis came together to the CID, where Ms. Cohill gave one statement and Ms. Davis, who was "[u]ncooperative[,]" gave four different statements. Sergeant Nelson testified that he found during his search of Ms. Cohill's car a

magazine and magazine follower for an AR-15 style magazine "that's commonly associated with a 223/5.56 caliber."

On January 3, 2021, Sergeant Nelson learned "through an NCIC hit" that the Defendant had been arrested in Montgomery, Alabama. That same day, he drove with two other law enforcement investigators to Montgomery and interviewed the Defendant. Sergeant Nelson stated that the Defendant waived his rights and provided two written statements. He said the Defendant wrote the first statement, and that Sergeant Nelson wrote the second statement at the Defendant's dictation after the Defendant said he did not want to write any more. The Defendant's first statement, handwritten by the Defendant, reads:

> I met [Codefendant Taylor] on Wooten St. We both rode past [the victim] in separate vehicles. We go inside the house to grab our clothes about time we make it outside [the victim] walking up in all black with his hands in his pocket rapping a song nodding his head staring [Codefendant Taylor] down[.] I asked wassup and he walked up on me. We face to face nose to nose so I mugged him before he can come out of his pocket or do anything[.] [Codefendant Taylor] let off warning shot to the ground that aint stop [the victim] so he shot at his legs. [The victim] fell we pulled off. Went to Ripley then met my ride back home in Brownsville when the tire went flat. We then drop [Codefendant Taylor] off in Jackson as I and my ride was headed back to Nashville. My sister also stated she saw the neighbors grab something off [the victim] and run in the house. I asked [Codefendant Taylor] why he stated "bruh [indecipherable] had a gun and [he] showed me [the victim's] snapchat post saying "He won't go out like Craig he won't put his gun down."

The Defendant's second statement, dictated by the Defendant and handwritten by Sergeant Nelson, reads:

> I met [Codefendant Taylor] on Wooten. We both rode past [the victim] in all black. We were in separate vehicles. We went to my aunt, Monique Hall's house and went inside. We came out of my aunt's house and we saw [the victim] in all black rapping and staring at [Codefendant Taylor] with his hands in his pocket. I asked what[']s up and he said what[']s up and we got nose to nose. I then punched [the victim] in the side of his head. Before [the victim] could do anything [Codefendant Taylor] fired warning shots into the ground. [The victim] didn[']t stop so [Codefendant Taylor] fired more rounds at his legs. [The victim] fell and [Codefendant Taylor] fired again. We then hopped in the car with [Ms. Davis] and she sped off.

We went to [Ms. Davis's] house in Ripley. I then started calling my brother Fred for a ride to Nashville. We left [Ms. Davis's] house and got to Brownsville then got on the Interstate. When we got on the Interstate [Ms. Davis] had a blowout. Fred pulled up and drove all of us to Jackson. When we got to Jackson, Fred dropped off [Codefendant Taylor] and [Ms. Davis] and we went to Nashville.

Sergeant Turner testified that the Defendant never said that the victim had a gun or fired any shots, that the Defendant was frightened, or that the Defendant thought that he, Codefendant Taylor, or Ms. Davis were in any danger. He said the Defendant did not call 911 or render aid to the victim. He stated that the Defendant had two cell phones that the police searched approximately nine days after the shooting, but that nothing of significance was found on the cell phones. He said he was never able to locate Codefendant Taylor. During Sergeant Turner's testimony, a video recording of his interview with the Defendant was also admitted as an exhibit and played for the jury.

Sergeant Turner identified photographs of the shell casings found in the street. He said that one of the 9mm shell casings was in "decent condition" while the second 9mm shell casing appeared to have been run over by a vehicle. The two 9mm shell casings did not appear to be old, as they did not "show any si[gn] of outside deterioration that you would expect a weathered shell casing to have[.]" Likewise, the 223/5.56 shell casing appeared "[n]ewer[,]" showing no signs of having been run over or of having been out in the weather.

On cross-examination, Sergeant Turner testified that a 9mm bullet fragment was recovered from Ms. Cohill's car. He stated that the fragment was submitted to the Tennessee Bureau of Investigation for testing but that no results were obtained. He testified that he did not know what the Defendant meant by his statement that he "won't go out like Craig" and "he won't put his gun down." He stated that he did not recover the victim's cell phone, did not speak to the victim's mother, and did not receive any statements from Codefendant Taylor. After being asked to examine the two 9mm shell casings, Sergeant Turner testified that they were .40 caliber, not 9mm, but that .40 caliber "is still a common pistol caliber." He acknowledged that the two .40 caliber shell casings came from two different manufacturers. Finally, he agreed that the Defendant told him during his interview that Codefendant Taylor was using a .40 caliber pistol.

Marsha Hall, the Defendant's older sister and a correctional officer at the Lauderdale County Jail, testified on the Defendant's behalf that Codefendant Taylor was a friend of the Defendant who was "like family." She said the victim was a neighbor and a former friend of the Defendant. On the morning of December 27, 2020, the Defendant texted her asking if she could take him to see his sons, who had spent the night with their

maternal grandmother at the Defendant's aunt's house on Wooten Street. Ms. Hall said she picked the Defendant up from an apartment complex in Covington and took him to Wooten Street. The Defendant did not tell her that he was planning to meet anyone at the house; he just said that he was going to visit his sons and then have her take him to Mason "to his friend Fred so he c[ould] go home to Nashville."

Ms. Hall testified that she and the Defendant saw the victim as she pulled onto Wooten Street, and that they "all made eye contact." She said that the Defendant did not say anything about the victim, and that she did not see the Defendant "grab his phone or anything like that[.]" When she reached their aunt's house, she parked in her aunt's yard in front of the house, leaving her car engine running. Codefendant Taylor and Ms. Davis were parked on the street in front of the house, and Codefendant Taylor accompanied the Defendant and Ms. Hall inside the house.

Ms. Hall testified that the Defendant had a "big" firearm with him, which he tucked out of sight as he went inside the house. After about five minutes of visiting, the Defendant announced that he was leaving. Ms. Hall said that she had stayed behind to talk to their mother and was walking down the hallway with her nephews when she heard gunshots. The front door was shut, and she could not see what was happening outside. When the shooting stopped, she went outside and saw the victim lying on the ground on the other side of the street surrounded by a crowd of people. The Defendant was gone. She did not see anyone going through the victim's pockets, and she did not talk to the police. The next day, she talked to the Defendant, who told her that "he didn't do it. It was [Codefendant Taylor]."

On cross-examination, Ms. Hall acknowledged that she never went to the police. She said she assumed that the Defendant and the victim were no longer friends because they no longer hung out together. She acknowledged that another brother had died in Memphis in 2019 but said that she could not relate that brother's 2019 death to the cessation of the Defendant's friendship with the victim.

The Defendant elected not to testify and rested his case without calling any other witnesses. Following deliberations, the jury convicted him of first degree premeditated murder as charged in the indictment.

## ANAYLSIS

### I. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to sustain his conviction for first degree premeditated murder, arguing that there was insufficient proof of premeditation as well as insufficient proof that he was criminally responsible for the actions of his codefendant. The State argues that the evidence, viewed in the light most favorable to the State, was sufficient to show that the Defendant acted with premeditation. The State further argues that, even if it was Codefendant Taylor rather than the Defendant who fired the fatal shot, the evidence was sufficient to establish that the Defendant was criminally responsible for the victim's murder. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-91 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree premeditated murder is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). A person "acts intentionally . . . when it is the person's conscious objective or desire to . . . cause the result." Tenn. Code Ann. § 39-11-302(a). Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from

- 11 -

excitement and passion as to be capable of premeditation." *Id.* at § 39-13-202(e). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003).

Our supreme court has provided a non-exclusive list of factors from which a jury may infer premeditation, including the use of a deadly weapon on an unarmed individual; the particular cruelty of the killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; making preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and a defendant's calmness immediately after the killing. *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005) (citations omitted). Additional circumstances from which a jury may infer premeditation is the infliction of multiple wounds, *State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000); the defendant's failure to render aid to the victim, *State v. Dotson*, 450 S.W.3d 1, 86 (Tenn. 2014), and the establishment of a motive for the killing. *State v. Sims,* 45 S.W.3d 1, 8 (Tenn. 2001).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* at § 39-11-402(2). Criminal responsibility is not a separate crime but a "theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). "[U]nder the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred." *State v. Phillips*, 76 S.W.3d 1, 9 (Tenn. Crim. App. 2001). However, "the evidence must establish that [the] defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted or assisted its commission." *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013).

The Defendant, citing *Thacker*, argues that there was insufficient proof of premeditation because there was no evidence of any particular cruelty of the killing, of prior threats or declarations of an intent to kill the victim, that he procured his weapon for the purpose of killing the victim, that he or Codefendant Taylor made any plans beforehand for concealing the crime, that he destroyed any evidence, or that he was calm after the killing. The Defendant asserts that the proof from all the witnesses indicated that "this was a brief altercation" in which the victim was shot, and he asks that this court either reverse the conviction or amend it to second degree murder.

The Defendant, however, ignores the additional circumstances from which a jury may infer premeditation, including the infliction of multiple wounds, establishment of a possible motive for the killing, and the failure to render aid to the victim. Viewed in the light most favorable to the State, the evidence established that the Defendant, whose friendship with the victim had ended for some reason, made eye contact with the victim as he rode in a car past the victim, who was on foot. At his aunt's house, the Defendant met up with his friend, Codefendant Taylor, and they went into the house together, each armed with a gun. When the victim reached the house a few minutes later, the Defendant and Codefendant Taylor came back outside carrying their guns and initiated a confrontation with the victim. After the Defendant punched the victim and briefly wrestled with him, either the Defendant or Codefendant Taylor, or both, fired multiple gunshots at the unarmed victim, including the final, fatal gunshot to the victim's back after the victim had fallen to the ground. Afterward, the Defendant and Codefendant Taylor, rather than calling for help or attempting to aid the victim, fled together from the scene, with the Defendant eventually being apprehended in Alabama. This was sufficient evidence from which the jury could infer that the Defendant premeditated the killing, as well as sufficient evidence from which the jury could find the Defendant criminally responsible for the actions of his codefendant. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's conviction for first degree premeditated murder.

## II. Juror Acquainted with Ms. Taylor

As his next issue, the Defendant contends that the trial court erred in not excusing a juror who failed to disclose that she was acquainted with Ms. Earline Taylor. The Defendant argues that the juror's failure to disclose the relationship before she was sworn in as a juror gives rise to a presumption of prejudice. The State argues that the trial court properly declined to excuse the juror, who had only a casual relationship with Ms. Taylor. We agree with the State.

"The Sixth Amendment to the United States Constitution and Article I, Section IX of the Tennessee Constitution guarantee a criminal Defendant the right to trial by an impartial jury." *Caruthers v. State*, 145 S.W.3d 85, 94 (Tenn. Crim. App. 2003) (internal quotation marks omitted).

> When a juror willfully conceals (or fails to disclose) information on voir dire which reflects on the juror's lack of impartiality, a presumption of prejudice arises. . . . Therefore, failure to disclose information in the face of a material question reasonably calculated to produce the answer or false disclosures give rise to a presumption of bias and partiality[.]

*State v. Akins*, 867 S.W.2d, 350, 355 (Tenn. Crim. App. 1993) (citations and footnotes omitted). "The presumption of bias, however, may be dispelled by an absence of actual favor or partiality by the juror. Moreover, the [d]efendant bears the burden of proving a prima facie case of bias or partiality." *Caruthers*, 145 S.W.3d at 95 (citations omitted). "The determination of whether a juror is unable or disqualified to perform his duties lies within the sound discretion of the trial court." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *State v. Forbes,* 918 S.W.2d 431, 451 (Tenn. Crim. App.1995)).

Prior to Ms. Taylor's testimony, the juror informed a court officer that she did not know Ms. Taylor but had recognized who she was. When it was brought to the attention of the parties, defense counsel stated that he was not raising an objection to the juror based on what he had heard so far but requested that she be voir dired "just to be safe[.]" At the beginning of her voir dire on the topic, the juror first indicated that she had not recognized Ms. Taylor's name as a witness, telling the trial court, "After I came inside and I saw her sitting there . . ." Upon questioning by defense counsel, the juror testified that Ms. Taylor worked with the juror's mother-in-law and with the juror's husband, and that Ms. Taylor and the juror's mother-in-law were "both assistants in the same room." The juror said that Ms. Taylor had once sent a valentine to the juror's son, and that she and Ms. Taylor had worked together with others at the school "when [they] were cleaning up from the tornado[.]" However, she and Ms. Taylor had "only had a few minimal conversations[,]" and she did not know Ms. Taylor's last name until after she saw her sitting in the lobby.

Upon questioning by the trial court, the juror testified that she and Ms. Taylor both worked for the school system. She said she would say "hey" to Ms. Taylor if she saw her, but that they would be unlikely to have a conversation. When asked if there was anything about her knowledge of Ms. Taylor that would prevent her from listening to Ms. Taylor's testimony and judging it "fairly and impartially[,]" the juror responded in the negative.

At the conclusion of the voir dire, defense co-counsel stated that he had not heard anything that made him uncomfortable, noting that "[s]ometimes people know each other." The trial court agreed, observing that it had not heard anything "that's beyond the fact that when you live in a small town and try cases in a small town, you're bound to have jurors that know some of the witnesses." At that point, defense counsel announced that, despite defense counsel's opinion, the Defendant did not want the juror to serve on the jury, and that defense counsel was stating the Defendant's objection for the record. The trial court denied the Defendant's request that the juror be excused, explaining to the Defendant that the juror's familiarity with Ms. Taylor as a fellow resident in a small town, without any indication that the juror was biased toward Ms. Taylor or prejudiced against the Defendant, was an insufficient reason to excuse her from the jury.

We conclude that the trial court properly denied the Defendant's request for the juror to be excused. The juror's failure to disclose her familiarity with Ms. Taylor when the venire was asked if anybody knew Earline Taylor was explained by the juror's testimony that she had not known Ms. Taylor's last name, and that it was not until she saw her sitting in the lobby that she recognized her. The juror promptly informed a court officer as soon as she recognized Ms. Taylor, and she assured the trial court that her familiarity with Ms. Taylor would not affect her ability to be fair and impartial as she listened to the testimony. The Defendant has not shown any reason that the juror's casual acquaintance with Ms. Taylor prevented her from acting as a fair and impartial member of his jury. The Defendant is not entitled to relief on this issue.

### III. Limitation of Cross-Examination of Mr. Bady

As his next issue, the Defendant contends that the trial court erred in not allowing him to cross-examine Octavius Bady about his attempt to dispose of the gun that formed the basis for his conviction for convicted felon in possession of a firearm. The Defendant argues that the excluded testimony provided contextual background evidence, that the State opened the door to the testimony by asking whether the gun in Mr. Bady's conviction was related to the death of the victim, and that the denial of the evidence violated the Defendant's Sixth Amendment right to present a defense. The State argues that the trial court properly excluded the propensity evidence under Tennessee Code Annotated section 24-7-125 and Rule 404(b) of the Tennessee Rules of Evidence. We agree with the State.

In a jury-out discussion prior to Mr. Bady's testimony, defense counsel stated that Mr. Bady and Destanisy Gillard "were charged with tampering with evidence and convicted felon in possession [of a firearm] . . . for disposing of a firearm" "from a case where [Mr. Bady] was seen driving down the road threw a gun out the window and they found it." The prosecutor corrected that Mr. Bady and Ms. Gillard "were in a car and somebody threw out the gun[,]" that Mr. Bady had entered a negotiated plea to convicted felon in possession of a firearm, and that Ms. Gillard had been indicted for tampering with evidence based on the same set of facts. During the lengthy discussion that followed, defense counsel agreed with the trial court that he was seeking to inquire into the underlying facts of Mr. Bady's conviction to show Mr. Bady's action and conformity with a prior act, *i.e.*, that Mr. Bady was "a guy that disposes of guns[.]"

In the jury-out hearing that followed, Mr. Bady acknowledged that he had pled guilty to convicted felon in possession of a firearm, and that Ms. Gillard had "been charged out of the same event[.]" He said that the police did not find a gun on him, but that he "took the charge" because Ms. Gillard had five children and he "just didn't really want her going through that." He stated that Ms. Gillard had not done anything, and that he had been drinking and did not remember if he did anything either. On cross-examination, he

acknowledged that Ms. Gillard was driving that night, that he was in the passenger seat, that the police found the gun on the passenger side of the road, and that he had pled guilty to possession of the gun based on the above facts.

At the conclusion of the hearing, the trial court concluded that the evidence was inadmissible under Tennessee Code Annotated section 24-7-125 and Tennessee Rule of Evidence 404(b):

> So, I am not disputing any of that [facts underlying the conviction]. But under your own admission just then, the reason you want to show this evidence is to prove action and conformity with a character trait. So[,] I don't understand how I can let it in. Now, maybe you want to disagree with the legislature for applying Rule 404(b) to witnesses and not just the defendant. But I don't see what I can do. You've said that the reason you want it is to show action and conformity with, and this rule specifically says or this statute specifically says that in a criminal case evidence of other crimes or wrongs is not admissible to prove - - to show action and conformity with the character trait.

The trial court rejected the Defendant's argument that Mr. Bady's disposal of the gun was part of a common scheme or plan or a signature crime, as well as his argument that the Defendant's Sixth Amendment right to present a defense trumped the rules of evidence. The following day, the trial court rejected the Defendant's additional argument that the evidence provided necessary contextual background to show that disposing of a gun was what Mr. Bady did as part of his criminal enterprise, finding that a "one-off occurrence" was not enough to make it a criminal enterprise. However, the trial court allowed the Defendant to make an offer of proof.

In the offer of proof, Mr. Bady testified, among other things, that the victim did not have a gun, and that he did not take a gun off him. He stated that he was not worried about finding a gun on the victim because if the victim had a gun, it was the victim's gun, not his.

At the conclusion of the offer of proof, the trial court again ruled that the evidence was inadmissible, stating:

> So we've heard Mr. Bady's offer of proof now. We've heard the defense's offer of proof with Mr. Bady. The defense has said that they want to talk to him about the facts of the underlying conviction so that they can argue to the jury that they don't need to listen to him, because he's the type of person who disposes of guns. So looking at 24-7-125 as the Court said

- 16 -

yesterday before we broke, statute says, in the criminal case, evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual including a witness in order to show action and conformity with the character trait. While it does say it may be admissible for other purposes, the defense hasn't pointed out any other purposes for why it would be admissible.

It doesn't meet the definition of a signature crime. Doesn't show any type of motive or intent here. Mr. Bady while he says that he obviously can't be around guns as a convicted felon, he said if it was [the victim's] gun, it was [the victim's] gun. It wasn't his gun if there would have been one.

And so, the Court is not going to allow it in or is not going to allow the defense to ask Mr. Bady those questions under 24-7-125.

At the conclusion of Mr. Bady's direct examination testimony, the Defendant renewed his request to delve into the underlying facts of Mr. Bady's conviction, arguing that the State had opened the door by asking Mr. Bady if the gun in Mr. Bady's conviction was involved in the victim's case. The trial court denied the request, finding that the State's questions were not "enough to open the door to cure that issue."

Generally, the propriety, scope, manner and control of the cross-examination of witnesses rest within the sound discretion of the trial court. *State v. James*, 315 S.W.3d 440, 460 (Tenn. 2010); *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993); *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995). However, cross-examination is "subject to the restrictions created by the applicable statutes, rules of evidence, rules of criminal procedure, and the common law rules created by the appellate courts." *State v. Adkisson*, 899 S.W.2d 626, 644-45 (Tenn. Crim. App. 1994).

Tennessee Code Annotated section 24-7-125 provides:

In a criminal case, evidence of other crimes, wrongs, or acts is not admissible to prove the character of any individual, including a deceased victim, the defendant, a witness, or any other third party, in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

- 17 -

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Similarly, Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." "[O]ther purposes" have been defined to include the defendant's motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004). If the trial court substantially complies with the procedural requirements of Rule 404(b), we will review the trial court's determination for an abuse of discretion. *Thacker*, 164 S.W.3d at 240. (citations omitted).

As an initial matter, we address the Defendant's assertion that the trial court failed to substantially comply with the procedural requirements of Rule 404(b) because it did not make a finding on the record that the probative value of the excluded testimony was outweighed by the danger of unfair prejudice. As the State points out, the trial court was not required to make such a finding after determining that the evidence was inadmissible propensity evidence. As such, we review the trial court's ruling under the abuse of discretion standard.

We conclude that the trial court acted within its discretion in excluding the evidence. We agree that the Defendant's purpose for admitting the evidence - - to show that Mr. Bady was the kind of man who disposes of guns - -was classic propensity evidence prohibited by Rule 404(b) and Tennessee Code Annotated section 24-7-125. That Mr. Bady, a convicted felon, on one occasion threw a gun out of a car while being pursued by the police does not establish that taking and disposing of guns is part of Mr. Bady's common scheme or plan, show Mr. Bady's intent, motive, or opportunity for taking a gun from the victim, and is not necessary to provide contextual background to explain why Mr. Bady avoided talking to the police or to impeach Mr. Bady's testimony that the victim did not have a gun.

We further agree that the State did not open the door to the underlying facts of Mr. Bady's conviction by eliciting testimony that the gun involved in Mr. Bady's conviction did not come from the defendants and was not related to the victim's case. Nor was the Defendant deprived of his Sixth Amendment right to present a defense by the exclusion of

the evidence.  As the State points out, the Defendant was able to challenge Mr. Bady's testimony that the victim did not have a gun by getting Mr. Bady to concede that he did not check the victim's pockets, did not feel for anything on the victim, and did not know that the victim had a cell phone on him.  The Defendant was able to suggest that Mr. Bady was lying by having him acknowledge that, as a convicted felon, he could not be around anyone who had a gun.  The Defendant was also able to elicit testimony from the victim's mother that "Francis" had taken the victim's cell phone and shoes off him "at the time[,]" thereby leaving the suggestion with the jury that someone may have taken a gun off the victim's body.  The Defendant is not entitled to relief on this issue.

## IV.  Closing Argument

The Defendant next contends that the trial court erred by allowing the prosecutor to make inappropriate comments in closing without issuing an adequate curative instruction and without enforcing its order that the prosecutor retract the first inappropriate comment. Specifically, the Defendant complains of the prosecutor's referring to him as a "thug" and urging the jury to "do [its] duty."  The Defendant asserts that the term "thug" used by a white prosecutor to refer to an African American defendant was calculated to inflame the prejudices of the jurors, and that the phrase "do your duty[,]" combined with the prosecutor's earlier statement that the Defendant might "still get away with it," injected issues broader than the Defendant's guilt or innocence and made predictions of the consequences of the jury's verdict.  The State argues, among other things, that the Defendant is not entitled to relief on this issue, noting that the trial court promptly provided a curative instruction following the thug comment and reasonably determined that the second comment was not improper.  We, once again, agree with the State.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument."  *State v. Zirkle*, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law."  *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999).

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues

facts outside the record, other than those which are matters of common public knowledge. *Goltz*, 111 S.W.3d at 6.

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. *Middlebrooks*, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. *Id.* at 560.

Midway through the State's rebuttal argument, the following transpired:

[PROSECUTOR]:

. . . .

And you know, the first thing when you think about Wooten Street, if you know anything about it and hear about this, and Ms. Earline Taylor talked about it, I suggest she didn't say that there was a shooting every day on Wooten Street. You're the judge of the facts whether she said that. But she said she's fed up with it. She said there's too many. I say one shooting on Wooten Street is too many. It may not be dangerous by Memphis standards or Chicago standards, but it's more dangerous than it ought to be. I wonder why that is? It's because of thugs like [the Defendant] - -

[DEFENSE COUNSEL]: Judge, can we approach?

(WHEREUPON, a conference was held at the bench between counsel and the Court.)

[DEFENSE CO-COUNSEL]: That's entirely improper.

THE REPORTER: Hold on a second.

THE COURT: (Indiscernible) stop pointing your finger and waving around.

[DEFENSE CO-COUNSEL]: He's injecting broader issues beyond the facts. He's trying to say - -

[DEFENSE COUNSEL]: Judge, here, let me - -

- 20 -

[THE COURT]:  Hold on a second.  Hold on a second.  [Prosecutor], you need to retract.  The use of the term thug is inappropriate.

[DEFENSE COUNSEL]:  And, Judge, I would ask for a curative instruction.

[PROSECUTOR]:  That he's not a thug or that I shouldn't say it?

[DEFENSE CO-COUNSEL]:  That he's not and that you shouldn't say it.  And also that he's injecting these broader issues trying to impact - -

THE COURT:  Hold on a second.  Hold on a second.  Hold on a second.  I don't know if it's broader issues, because I think y'all raised up and made the argument that you can't prove these shell casings are from the shooting, because she testified there were multiple shootings in the neighborhood.

[DEFENSE COUNSEL]:  Right.  And I think comments on that there are multiple shootings, but I think he can comment on that, but I don't think he can get into propensity.  State versus Buckner.  And it's - -

[PROSECUTOR]:  What do you mean by propensity?

[DEFENSE COUNSEL]:  Just by calling somebody a thug that's propensity also.

THE COURT:  What type of curative instruction do you want me to give?

[DEFENSE CO-COUNSEL]:  I would like for you to state that what [the prosecutor] said was improper and that they're to disregard it.  And that any sort of larger issues that may be implicated by his statement - -

THE COURT:  I am going to say they need to ignore his comment that [the Defendant] was a thug.  That's what I'm going to say.

THE REPORTER:  Judge, I can't hear you.  Sorry.

. . . .

(WHEREUPON, the following proceedings continued within the hearing of the jury).

THE COURT: Ladies and gentlemen, I am going to ask you to ignore the comment from [the prosecutor] that [the Defendant] is a thug, all right.

Thereafter, the prosecutor continued his rebuttal argument with no objection raised by the Defendant regarding the adequacy of the trial court's curative instruction to the jury, or the prosecutor's failure to retract the comment. As the prosecutor concluded his argument, the following transpired:

[PROSECUTOR]:

. . . .

So you think about it when you think about why would somebody do that. How could they think they would get away with it? They very well could have. Now, I'll go a step further. He could still get away with it despite all of this, despite Earline Taylor, Kalea Davis, the work of law enforcement, everything, because ultimately it's your decision. So if you buy what the defense is selling, in fact, he will have gotten away with it. Do your duty, ladies and gentlemen.

[DEENSE COUNSEL]: Judge, I object.

THE COURT: All right. Well, are you coming around to speak to me?

[DEFENSE COUNSEL]: Yes, Judge.

(WHEREUPON, a conference was held at the bench between counsel and the Court.)

THE COURT: All right.

[DEFENSE COUNSEL]: Judge - -

THE COURT: Generally, we ask if we can approach.

[DEFENSE COUNSEL]: I'm sorry, Judge. I was so upset about it.

- 22 -

THE COURT:  What are we objecting to?

[DEFENSE COUNSEL]:  "Do your duty" is specifically prohibited from telling a jury, and I don't know why prosecutors still do it.  State of Tennessee versus Ronnie Cauthern, 967 –

THE COURT:  Keep your voice down.  The point of a bench conference is so that no one can hear us.

[DEFENSE COUNSEL]:  It's a specifically prohibited statement that you're not allowed to say to the jury when you're telling them what to do in closing.

[PROSECUTOR]:  My duty has always been to explain to them to follow the law and the evidence.

[DEFENSE COUNSEL]:  Earlier you said it, and I was fine with that.

THE COURT:  Let me see, what is the case cite?

[DEFENSE COUNSEL]:  I am more worried about which goes after.

[PROSECUTOR]:  I didn't say send a message or anything.

. . . .

THE COURT:  It says, the case says, "third, the statements to the jury should 'do its duty' and that its verdict should send a message to the community constituted a plea for general deterrence, which we have held has no application", he didn't say - -

[DEFENSE COUNSEL]:  Well, Judge, my fear is is that once he's already called my client a thug, the "do your duty" would be followed by something else.

THE COURT:  But it wasn't.

[DEFENSE COUNSEL]:  Right, I understand.

[DEFENSE CO-COUNSEL]:  I would say, Your Honor, his coupling "do your duty" with the immediately preceding statement of he might get

- 23 -

away with it is basically saying if you don't do your duty, he's going to get away with it.

[DEFENSE COUNSEL]: It's the broader issue.

THE COURT: I mean, I think his argument is the State thinks he's guilty. If they find him not guilty, then the State thinks he got away with it.

[DEFENSE COUNSEL]: I know. But to say, he'll get away with it and you should do your duty, that's injecting broader influences under Goltz. And I think the same conclusion would be reached by Cauthern.

THE COURT: I mean, Cauthern specifically says, "and that its verdict should send a message to the community", he didn't say that. So I am going to let it slide.

We agree that the prosecutor's reference to the Defendant as a thug was improper, although we do not necessarily agree that it was intended as a racial slur to purposefully inflame the prejudices of the jury. Regardless, the trial court immediately issued a curative instruction to the jury to disregard the comment, and we must presume that the jury followed the curative instruction. *See State v. Ivy*, 188 S.W.3d 132, 145 (Tenn. 2006); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994). Furthermore, the Defendant did not raise a contemporaneous objection to the adequacy of the trial court's curative instruction or to the trial court's failure to enforce its order that the prosecutor retract the comment. As such, this issue is waived. *See* Tenn. R. App. P. 36 (a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.")

We conclude that there was nothing inappropriate in the prosecutor's ending his rebuttal argument by telling the jury to do its duty. As the trial court observed, the prosecutor did not follow the statement with an exhortation that the jury, by its verdict, send a message to the community, which would have constituted an inappropriate plea for general deterrence. *See State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998) ("[S]tatements that the jury should 'do its duty' and that its verdict should send a message to the community constituted a plea for general deterrence, which we have held has no application to either aggravating or mitigating factors.") (citations omitted). "Because closing argument affords an opportunity to persuade the jury, leeway should be given regarding the style and substance of the argument. Hence, counsel may employ forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." *State v. Sexton*, 368 S.W.3d 371,

419 (Tenn. 2012) (internal quotations and citations omitted). We agree with the State that the prosecutor's closing his argument by urging the jury to do its duty must be viewed in the context of the prosecutor's earlier statements, in which he argued that "the most basic thing about jury duty is you listen to the law[,]" "come in and learn what a legal term means" and "listen when the judge defines premeditation." The Defendant is not entitled to relief on this issue.

## V. Cumulative Error

Finally, the Defendant contends that the cumulative effect of the various errors prevented him from receiving a fair trial. "The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76-77 (Tenn. 2010) (citations omitted). The cumulative error doctrine only applies when there has been more than one error committed during the trial proceedings. *Id.* at 77. We conclude that the Defendant is not entitled to relief under the doctrine of cumulative error.

## CONCLUSION

Based on our review, we affirm the judgment of the trial court.

s/ John W. Campbell
JOHN W. CAMPBELL, SR., JUDGE

- 25 -